UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOINT STOCK COMPANY "CHANNEL ONE RUSSIA WORLDWIDE,"

    Plaintiff,

-against-

RUSSIAN TV COMPANY INC., et al.,

    Defendants.

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/1/20
```

18-CV-2318 (LGS) (BCM)

**ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Joint Stock Company "Channel One Russia Worldwide" (Channel One), a Moscow-based television broadcaster, alleges that defendant Russian TV Company, Inc. (RTV), a New York corporation owned by defendant Steven Rudik, has "pirated" its programming and is selling it to subscribers in the United States, via internet protocol television (IPTV), without authorization or license fees. *See* Second Amended Complaint (SAC) (Dkt. No. 189) ¶¶ 5, 46. Discovery is nearly complete. One deposition remains to be taken: of Olga Panfilova, an executive at Kartina Digital GmbH (Kartina), in Weisbaden, Germany. That deposition, in turn, awaits the resolution of the parties' remaining privilege disputes, outlined in their joint letter dated February 11, 2020 (Joint Ltr.) (Dkt. No. 220). This Order resolves those disputes.

## Background

Kartina distributes Russian-language television programming throughout the world. It was until recently "an authorized IPTV distributor of Channel One Programming" in the United States, SAC ¶ 6, giving it a significant economic interest in combatting unlawful sales of Channel One content in the United States. To that end, in July 2014, Kartina retained the law firm Dunnington Bartholow & Miller LLP (Dunnington) to investigate the "piracy of Channel One's programming in the United States" and to represent Channel One (and other Russian broadcasters) in this and other actions against various alleged pirates. *See* Declaration of Olga

Panfilova dated October 11, 2019 (Panfilova Decl.) (Dkt. No. 191), ¶¶ 51-52. At least until late 2019, Kartina paid Dunnington's fees and directed its litigation strategy. *Id.*[1] Moreover, as discussed in more detail below, Kartina has provided much of the evidence in this action concerning defendants' alleged misconduct, either directly – through its own personnel, including Panfilova – or indirectly, through the Dunnington personnel who have carried out various investigatory activities at Kartina's behest. Thus, as the Court found on October 31, 2019, although Kartina is "not formally a plaintiff here," it "effectively controls and directs this litigation." Oct. 31 Tr. at 16:10-12. For that reason, and others, the Court granted defendants' motion to compel the production of otherwise-discoverable Kartina documents in this action. *See id*. at 12:22-20:8; Order dated Nov. 1, 2019 (Dkt. No. 202), ¶ 2.

Beginning in 2011, Kartina sold defendant Rudik "access codes" to its Russian language IPTV "package," which included Channel One programming (the Kartina Package), for resale in the United States. SAC ¶ 6; Verified Answer (Ans.) (Dkt. No. 199) ¶ 6; Panfilova Decl. ¶¶ 4-7. In early 2017, Kartina "ended its relationship with Rudik" after he "secretly launched a competitive service under the RTV brand," through which he undercut Kartina's prices. Panfilova Decl. ¶¶ 15-22. Rudik was apparently permitted, however, to continue reselling the access codes he had previously purchased, and defendants have interposed those sales as an affirmative defense to Channel One's claims. *See* Ans. at 26 ("Plaintiff is barred in whole or in part from recovering damages related to Defendants' alleged conduct to the extent Defendants

---

[1] According to Panfilova, "Kartina has not distributed Channel One programming since July 31, 2019." Panfilova Decl. ¶ 49. On October 31, 2019, Channel One's lead counsel, Dunnington partner Raymond J. Dowd, reported that although Kartina was still the firm's client, "my last bills have gone to Channel One." Tr. of Oct. 31, 2019 Discovery Conf. (Oct. 31 Tr.) (Dkt. No. 203) at 11:17-12:10.

2

received access to programming from providers licensed by Channel One, including, among others, Kartina Digital GmbH.").

The parties dispute how much of RTV's business consists of lawful resales of previously-purchased Kartina access codes, and how much consists of unlawful sales of "pirated" programming for which defendants hold no license or sublicense. *Compare*, *e.g*., Def. Mem. dated Sept. 20, 2019 (Dkt. No. 178), at 1 (asserting that RTV lawfully purchased "over $1.2 million in access codes from Kartina" and that those access codes "were responsible for a vast majority of RTV's revenue between 2015 and 2018") *with* Pl. Mem. dated Oct. 11, 2019 (Dkt. No. 193), at 15 ("Kartina estimates that Rudik made approximately $320,000 from the sale of Kartina access codes, not $1.2 million."). Plaintiff's estimates are based, in large part, on Panfilova's attestation that Kartina can "trace RTV's reselling of access codes" and the figures she provides, in her declaration, for the number of access codes sold to Rudik that were "activated by consumers" in 2016, 2017, and 2018. Panfilova Decl. ¶¶ 33-41. Consequently, I ordered plaintiff and Kartina to produce "[a]ll documents and data concerning the investigations described in ¶¶ 33-41 of the Declaration of Olga Panfilova dated October 11, 2019." Nov. 1 Order ¶ 2(c).

I also ordered plaintiff and Kartina to produce "[a]ll communications between Dunnington, on the one hand, and Kartina and/or Channel One, on the other hand . . . concerning any previously-disclosed investigation into the alleged misuse of Channel One's Programming, copyrights, or trademarks by defendants." Nov. 1 Order ¶ 2(b). One of those "previously-disclosed investigation[s]" was conducted by Dunnington associate Akbar Khan, who executed a declaration describing what he observed in August 2019 when he logged into an "app" marketed

3

by defendant RTV for use with a Samsung Smart TV. *See* Declaration of Akbar Khan dated August 27, 2019 (Dkt. No. 163), ¶¶ 3-14.

On December 20, 2019, I authorized defendants to take Panfilova's deposition once the parties' remaining disputes concerning the Channel One/Kartina document production were resolved. (Dkt. No. 211.) On February 11, 2020, the parties filed their joint letter, explaining that they continued to disagree over two categories of documents withheld as privileged: (1) emails between Panfilova and Dunnington concerning a passcode needed by Khan to log into the Samsung RTV app; and (2) emails between Panfilova and Dunnington "transmitting documents and information that Panfilova relied on in her Declaration." Joint Ltr. at 2. Thereafter, in accordance with my Order dated February 12, 2020 (Dkt. No. 221), plaintiff and Kartina submitted five of the disputed documents for *in camera* review: (1) both of the challenged emails regarding the passcode for Khan; and (2) three exemplar emails between Panfilova and Dunnington.[2] In addition, Dunnington submitted a letter-brief dated February 19, 2020 (Pl. Ltr.) (Dkt. No. 222), on behalf of both Channel One and Kartina, arguing that all of the disputed documents are protected by the attorney-client privilege, the work product doctrine, and/or the common interest privilege. Defendants had an opportunity to file their own letter-brief on the same date but did not do so.

The Court has carefully reviewed the challenged documents *in camera* and has concluded that only the emails regarding the passcode for Khan must be produced.

---

[2] According to defendants, there are a total of eight documents in this category. Joint Ltr. at 2.

**Category 1: Emails Regarding Passcodes**

On August 7, 2019, at 9:28 a.m., Dunnington partner Dowd emailed Panfilova to request "a new working RTVCO password for the US," explaining that Khan needed it to "collect evidence." On August 8, 2019, at 3:14 a.m., Panfilova responded with a password. No other subjects are discussed in the August 7 and 8, 2019 emails.

Plaintiff and Kartina do not seriously contend that these emails are privileged. Nor could they. As this Court has repeatedly ruled, a party that chooses to use its litigation counsel to perform factual investigations, and submits counsel's sworn testimony concerning those investigations as evidence going to the merits, has waived any otherwise applicable privilege as to the disclosed investigations. *See* Oct. 31 Tr. at 26:20-25 ("[O]nce you put the result out there, once you say this is what I found or this is what I saw, work product has been waived with respect to that investigation. And the opposing party is generally entitled to get the information and documents it needs to understand what exactly was done."); *see also* Tr. of Dec. 19, 2019 Discovery Conf. (Dkt. No. 214) at 37:5-10 ("[W]ith respect to any investigation which has been disclosed, that is, any investigation the results of which the plaintiff has used in this case, there is no longer any underlying claim of attorney-client privilege or work product with respect to whatever the documents are underlying that."); *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, No. 16-CV-1318 (GBD) (BCM), 2019 WL 4727537, at *20 (S.D.N.Y. Sept. 26, 2019) (quoting *United States v. Nobles*, 422 U.S. 225, 239-40 (1975)) ("Respondent, by electing to present the investigator as a witness, waived the privilege with respect to matters covered in his testimony."), *aff'd*, 2020 WL 1479018 (S.D.N.Y. Mar. 26, 2020). Moreover, during the October 31, 2019 conference, plaintiff's lead counsel specifically addressed the issue now

presented, stating, "I think if Mr. Khan was provided with a password from Kartina, then I think that's fair game." *Id*. at 27:1-2.

Instead, plaintiff argues that defendants do not "need" the two emails concerning an RTV passcode for Khan (because they are "capable of replicating the results" through other means), and that if defendants are given the passcode that Khan used, they may "shut down the account associated with the passcode, inhibiting further investigation into Defendant's piracy." Pl. Ltr. at 3-4. Defendants' "need" for the emails is irrelevant to the question whether they must now be produced. In the absence of any privilege, it is enough that the documents fall squarely within ¶ 2(b) of my November 1, 2019 Order. Plaintiff's concern about RTV shutting down Kahn's account may be genuine, but is easily alleviated with an order prohibiting RTV from doing so.

**Category 2: Emails Regarding Facts Discussed in the Panfilova Declaration**

On August 1, 2019, at 3:46 p.m., Dunnington paralegal Christopher Vidulich sent an email to Panfilova attaching screenshots of RTV's channel list. On August 2, 2019, at 5:08 a.m., Panfilova replied, informing Vidulich that certain channels offered by RTV were not part of the Kartina Package. Two months later, in her October 11, 2019 declaration, Panfilova made a similar point more generally, writing that "when Kartina learned of Rudik's violation of the reseller agreement, Rudik was showing channels not included in the Kartina Package," Panfilova Decl. ¶ 43, and therefore was not simply reselling Kartina access codes.

The screenshots attached to Vidulich's August 1 email are not privileged (as plaintiff recognizes) and have apparently been produced.[3] Plaintiff is correct, however, that the emails themselves, between Panfilova and Vidulich, are privileged attorney-client communications, as

---

[3] According to plaintiff, all of "the documents underlying the Category 2 exemplars have been produced," Pl. Ltr. at 2, including "the attachments to the emails." *Id*. at 3.

to which the privilege has not been waived. Under federal common law – which governs privilege issues in federal question cases, *see* Fed. R. Evid. 501, the elements of the attorney-client privilege are well-settled:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*United States v. United Shoe Mach. Corp.,* 89 F. Supp. 357, 358-59 (D. Mass. 1950). *Accord Obeid v. Mack*, 2016 WL 7176653, at *3 (S.D.N.Y. Dec. 9, 2016); *Gucci Am., Inc. v. Guess?, Inc.*, 2011 WL 9375, at *1 (S.D.N.Y. Jan. 3, 2011); *S.E.C. v. Beacon Hill Asset Mgmt. LLC*, 231 F.R.D. 134, 138 (S.D.N.Y. 2004); *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 441 (S.D.N.Y. 1995) (all quoting *United Shoe*, 89 F. Supp. at 358-59). The privilege "exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn Co. v. United States,* 449 U.S. 383, 390, 101 S. Ct. 677, 683 (1981); *accord Hollis v. O'Driscoll*, 2013 WL 2896860, at *2 (S.D.N.Y. June 11, 2013).

The August 1 and 2 emails between Kartina executive Panfilova and Vidulich – a "subordinate" of Kartina's counsel – "relate to" facts (in this instance, facts concerning which channels were part of the Kartina Package) communicated by the client to its counsel, in confidence, for the purpose of securing assistance in this action. The facts themselves are not, of course, privileged, *see In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1037 (2d Cir. 1984) ("the attorney-client privilege protects communications rather than information"), and "cannot be invested with privilege merely by communicating them to an

7

attorney." *Solomon v. Sci. Am., Inc.*, 125 F.R.D. 34, 37 (S.D.N.Y. 1988). Conversely, however, "the confidentiality of the communication is not destroyed by disclosure of the underlying facts." *Id*. Thus, the privilege protecting Panfilova's communications with counsel was not waived simply because she discussed some of the same facts (or closely related facts) in her October 11, 2019 declaration. *See*, *e.g.*, *Hudson v. Gen. Dynamics Corp.*, 186 F.R.D. 271, 275-76 (D. Conn. 1999) (clients' responses to questionnaires prepared by their counsel remained privileged even though the responses were "used in drafting of proffered affidavits"). As the *Hudson* court explained, "the fact that [plaintiffs'] responses were used by their attorney to assist in drafting their affidavits which they then individually signed under oath is not alone a use that should waive the attorney client privilege, just as notes taken by counsel from a client's oral account would not be discoverable simply because they were used to assist counsel in drafting an affidavit thereafter." *Id*. at 276; *see also Vodak v. City of Chicago*, 2004 WL 783051, at \*2 (N.D. Ill. Jan. 16, 2004) (completed questionnaires by prospective clients were privileged); *Hydraflow, Inc. v. Enidine Inc.*, 145 F.R.D. 626, 635 (W.D.N.Y. 1993) (letter from client to attorney containing "a detailed discussion of the key physical and operational elements of the snubber," which was "intended to assist counsel in preparing an application to the Patent Office" incorporating those facts, was a "confidential communication" protected by the attorney-client privilege both before and after the application was filed).

The same is true with respect to the remaining "category 2" exemplars. On August 22, 2019, at 5:53 a.m., Panfilova emailed Dowd – after reviewing a "list of Rudik's clients that Chis [Vidulich] sent me" – and provided a series of comments and observations about what, in her

view, that list did and did not establish.[4] To illustrate her points, Panfilova attached various documents, including screenshots and photographs showing the differences between the channels offered by and the online interfaces provided by Kartina and RTV, respectively. At 5:35 p.m. on August 22, 2019, Dowd emailed Khan, forwarding an earlier email, dated June 26, 2019, from Panfilova to Dowd (with copies to other Dunnington and Kartina personnel), in which Panfilova provided factual information concerning Kartina's access codes, the codes sold to Rudik, and how the later use of those codes could be tracked by Kartina. She attached a printout showing, among other things, when the various Kartina access codes sold to Rudik were activated.

Once again, while the attachments to these emails are not privileged, the emails themselves are confidential communications between attorney and client that were properly withheld from production. These *communications* did not lose the protection of the attorney-client privilege merely because Panfilova later discussed some of the same *facts* in a declaration. *Solomon*, 125 F.R.D. at 37. Were that the case, no client could safely discuss significant facts with her attorney – much less work with that attorney to prepare a declaration asserting those facts – for fear that the attorney-client privilege would be deemed waived once the declaration was filed. *See Hudson*, 186 F.R.D. at 276 ("a finding that the plaintiffs have waived their privilege merely by the fact that their questionnaire responses were used to draft the plaintiffs' affidavits opens too wide a door on this important privilege"); *United States v. Gumbaytay*, 276 F.R.D. 671, 680 n.9 (M.D. Ala. 2011) (fact that attorney used client interview notes to prepare a publicly-filed form did not result in a waiver of the privilege protecting the notes themselves; "[s]uch a ruling would, by extension, strip all client communications used to

---

[4] The Court presumes that the "list of Rudik's clients" was a document produced in discovery by defendants.

draft an administrative or court complaint of their privileged status as soon as that complaint was filed").

## Conclusion

For the reasons stated above, it is hereby ORDERED that the "category 1" emails be promptly produced to defendants, who may not use the information contained therein to shut down or disable Akbar Khan's account. If any of the documents attached to the "category 2" emails have not yet been produced, they must now be promptly provided to defendants. The emails themselves, however, need not be produced.

It is further ORDERED that the parties cooperate in good faith to complete the deposition of Olga Panfilova no later than **June 1, 2020**, at which point all discovery will be concluded. In light of the ongoing COVID-19 pandemic, it is further ORDERED, pursuant to Fed. R. Civ. P. 30(b)(3) and (b)(4), that the Panfilova deposition may be taken via telephone, videoconference, or other remote means, and may be recorded by any reliable audio or audiovisual means.[5]

Dated: New York, New York
       May 1, 2020

                                              **SO ORDERED**.

                                              **BARBARA MOSES**
                                              **United States Magistrate Judge**

---

[5] This Order does not dispense with the requirements set forth in Fed. R. Civ. P. 30(b)(5), including the requirement that, unless the parties stipulate otherwise, the deposition be "conducted before an officer appointed or designated under Rule 28," and that the deponent be placed under oath by that officer. For avoidance of doubt, a deposition will be deemed to have been conducted "before" an officer so long as that officer attends the deposition via the same remote means (*e.g.*, telephone conference call or video conference) used to connect all other remote participants, and so long as all participants (including the officer) can clearly hear and be heard by all other participants.