UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                          :
JOINT STOCK COMPANY "CHANNEL ONE          :
RUSSIA WORLDWIDE,"                                 :
                                                          :          18 Civ. 2318 (LGS)
                                         Plaintiff,     :
            -against-                                  :          **AMENDED FINDINGS**
                                                          :          **OF FACT AND**
RUSSIAN TV COMPANY, et al.,                    :          **CONCLUSIONS OF**
                                                          :          **LAW**
                                                          :
                                      Defendants.  :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

        Plaintiff Joint Stock Company "Channel One Russia WorldWide" brings this action

against Defendants Russian TV Company, Inc. ("Russian TV"), SR Express Consulting Inc.

d/b/a/ Techstudio ("Techstudio"), Servernaya Inc. ("Servernaya"), ESTIDesign, Inc.

("ESTIDesign") and their owner, Steven Rudik.  The Second Amended Complaint (the

"Complaint") alleges violations of the Federal Communications Act ("FCA") and the Copyright

Act.  Plaintiff agreed that resolution of its claims under the FCA in its favor would resolve all

claims, including those for copyright.  The parties agreed to proceed by summary trial on the

papers.  The Court now issues findings of fact and conclusions of law pursuant to Federal Rule

of Civil Procedure 52(a).

I.      **BACKGROUND**

        The background facts below are drawn from witness affidavits and declarations,

documentary evidence, deposition transcripts, the parties' Rule 56.1 statements and other

submissions for the summary trial.  The facts are either undisputed or determined by the Court

based on the parties' submissions.

Plaintiff produces and broadcasts television programming (the "Programming"), which enjoys a large audience in the Russian Federation and other members of the Commonwealth of Independent States.  Plaintiff enters into licensing agreements that grant third parties the right to broadcast a version of the Programming in the United States.  While not named as a plaintiff, Kartina Digital GmbH ("Kartina") is a television programming provider that was previously authorized to stream the Programming in the United States, and that is at least partially funding this litigation on behalf of Plaintiff.

Steven Rudik owns and operates the other Defendants -- Russian TV, Techstudio, Servernaya and ESTIDesign.  Defendant Russian TV is a New York corporation that owns and operates a website through which it provides access to the Programming in the United States in exchange for a subscription fee.  Defendant Techstudio is a business that, inter alia, provides foreign-language broadcasting to distinct ethnic communities in the United States and around the world and advertises subscriptions for Russian TV to U.S. consumers.  Defendant Servernaya is a New York corporation that, among other things, hosts servers and provides hosting services to Techstudio.  Defendant ESTIDesign is a New York corporation that designed Russian TV's website and was listed on the Samsung Smart TV App Store as the developer of a Samsung Application ("RTV App") that provides access to Defendants' internet protocol television service ("IPTV").

In brief, Plaintiff alleges that Defendants illegally rebroadcast the Programming through IPTV, which provides Russian TV subscribers streaming of over 200 television channels including those owned by Plaintiff.  Russian TV subscribers can access IPTV through mobile devices, Russian TV's website, set-top boxes ("STBs"), computers and Smart TVs.  Defendants

argue that they were permitted to rebroadcast the Programming because they had legitimate access codes purchased from Kartina and other vendors who were authorized to rebroadcast the Programming.

## II.     BURDEN OF PROOF

To establish a violation of the Communications Act, Plaintiff must prove its claims by a preponderance of the evidence. *See J & J Sports Prods., Inc. v. Port Richmond Emporium Corp.*, No. 12 Civ. 4926, 2014 WL 692189, at *5 (E.D.N.Y. Feb. 21, 2014).  Defendants bear the burden of proving an affirmative defense. *See United States v. Livecchi*, 711 F.3d 345, 352 (2d Cir. 2013).

## III.    FINDINGS OF FACT

The Programming bears a trademark and is distributed via transmission to a satellite, which transmits the Programming to the Commonwealth of Independent States.  Plaintiff enters into license agreements with third parties to distribute a version of its Programming in the United States.  The Programming is encrypted, and Plaintiff issues de-encryption devices to permit access by authorized recipients.

Plaintiff authorized Kartina to stream the Programming until July 2019.  Kartina sold Defendant Techstudio access codes to the Programming between January 2011 and February 2017.  Defendant Techstudio purchased from Kartina 2,117 STBs, 18,311 3-day, 31,888 1-month, 200 3-month and 2,975 1-year access codes pursuant to an agreement with Kartina.  Defendants were authorized to resell Kartina access codes, which provided access to the Programming, until February 2017.  In March 2017, Kartina informed Defendant Russian TV that it would no longer sell its access codes to Russian TV.  As of July 2017, all but one of the access codes Techstudio had purchased from Kartina had expired.  (Kartina seems to have

3

viewed Rudik and his companies Techstudio and Russian TV interchangeably; they are referred to above, somewhat inconsistently, as Kartina referenced them).

Defendant Techstudio then purchased access codes from three other dealers -- Apeiron Global Services Inc. ("Apeiron"), Digital Security Networks Ltd. and Digital Services LLC (collectively "Third Party Vendors").  These access codes included 3,452 Kartina access codes. The Third Party Vendors were not licensed or authorized by Plaintiff to distribute the Programming or sell access codes to view the Programming.

In addition to STBs purchased from Kartina, Defendant Techstudio purchased several thousand STBs from non-party Infomir, LLC ("Infomir") and from a Chinese supplier.  At least 3,000 of these STBs purchased from Infomir were customized to enable "plug and play access," which allows a customer to watch the Programming without entering an access code.  Two of Plaintiff's investigators were able to view the Programming on a Smart TV through these STBs without entering an access code.  A third-party developer hired by Techstudio designed the RTV App, although the Samsung App Store lists it as developed by Defendant ESTIDesign.  The RTV App functions like an STB and provides access to the Programming.  Russian TV subscribers downloaded the RTV App at least 200 times.

Russian TV has admitted to having at least 1,964 subscribers who can view Russian-language television programming through Russian TV's website, STBs, computers, mobile devices and Smart TVs.  Certain subscriptions to Russian TV permit access to the Programming.

Defendant Rudik owns the other Defendants, and controls and directs their operations and finances.  Rudik derives his income in part from the other Defendants' operations, including the streaming of the Programming.

**IV.     CONCLUSIONS OF LAW**

**A.     FCA § 605(a)**

Plaintiff seeks statutory damages for Defendants' unauthorized streaming of the Programming in violation of FCA § 605(a), 47 U.S.C. § 605(a).  Plaintiff has shown by a preponderance of the evidence that each of the Defendants rebroadcast the Programming, or assisted in doing so, without authorization.  Specifically, (1) Russian TV sold subscription packages containing unauthorized access codes to rebroadcast the Programming; (2) Techstudio purchased unauthorized access codes from Third Party Vendors for Russian TV's use; (3) Servernaya paid for and leased equipment for Russian TV subscribers; (4) ESTIDesign designed Russian TV's website, which sells subscriptions providing access to the unauthorized access codes and (5) Rudik, as the owner, controlled these other Defendants and directed their activities.

As relevant here, the third sentence of the FCA § 605(a) states that "no person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication . . . for the benefit of another not entitled thereto."  A defendant is liable if a plaintiff can show that the defendant "received a satellite-originated signal and then retransmitted that signal to third parties (for example, via IPTV) without authorization and for financial gain."  *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, No. 16 Civ. 1318, 2019 WL 8955234, at *11 (S.D.N.Y. Oct. 25, 2019) (internal quotation mark omitted), *R. & R. adopted sub nom. Joint Stock Co. "Channel One Russia Worldwide" v. Infomir LLC*, No. 16 Civ. 1318, 2020 WL 1467098 (S.D.N.Y. Mar. 26, 2020).  Where the bounds of liability under § 605 are unclear -- for example, the applicable statute of limitations -- analogies to the Copyright Act, 17 U.S.C. § 507(b), are persuasive.  *See id.* at *12.

The parties do not dispute that the Programming is a satellite-originated signal protected by FCA § 605(a), and that Defendants received the signal and then retransmitted it to Russian TV subscribers for financial gain, or assisted in doing so.  The parties also agree that Defendant Russian TV's streaming service has or had 1,964 subscribers.  The parties dispute whether Russian TV's retransmission of the Programming to Russian TV's subscribers was "without authorization." and how many timely violations, if any, resulted from Russian TV's rebroadcasting to its subscribers.

1. **"Without Authorization"**

Plaintiff has sustained its burden of showing that Defendants retransmitted the Programming "without authorization" or assisted in doing so.  Defendant Techstudio purchased 53,374 Kartina access codes between January 2011 and February 2017, which resulted in authorized retransmissions.  Defendant Techstudio purchased at least 6,575 access codes (3,452 of which were Kartina access codes) from Third Party Vendors from 2015 to 2018, which resulted in unauthorized retransmissions.

Plaintiff authorizes certain persons or entities to receive the satellite transmissions that contain the Programming.  One such entity was Kartina, which sold 53,374 access codes to Defendant Techstudio between January 2011 and February 2017.  In March 2017, Kartina informed Defendant Russian TV that it would no longer sell Russian TV access codes.  The Kartina access codes provided access for specified periods of time -- of up to a year -- to a bundling of Russian-language programming including the Programming.  Access codes cannot expire until they are activated.  All but one of the access codes Techstudio purchased from Kartina had expired by July 2019.  Defendants' use of these access codes (purchased directly from Kartina) resulted in retransmission of the Programming *with* authorization.

6

Techstudio also purchased at least 6,575 access codes (3,452 of which were Kartina access codes) from Third Party Vendors, but these vendors were not licensed or authorized by Plaintiff to distribute the Programming, which they did by selling the access codes.  Russian TV's rebroadcasting of the Programming with Third Party Vendor access codes was therefore unauthorized..

Russian TV continued to transmit the Programming to its subscribers until at least August 2020.  From the time Defendant Techstudio began purchasing unauthorized access codes from Third Party Vendors in 2015, Defendant Russian TV was rebroadcasting Programming with those access codes (purchased from Third Party Vendors) without authorization.  From September 2019 and later, when Defendants were relying entirely on non-Kartina access codes from the Third Party Vendors, Defendant Russian TV's rebroadcasting of the Programming was entirely unauthorized.  Defendants' rebroadcasting without authorization, or assisting in doing so, was in violation of FCA § 605(a).

2. **Statute of Limitations**

Defendants admit to Russian TV having at least 1,964 subscribers as reflected on Russian TV's subscriber list.  Of these, 1,355 subscriptions were purchased on or after March 15, 2015. This evidence is sufficient to satisfy Plaintiff's burden of showing unauthorized use in violation of § 605(a) on or after March 15, 2015, three years before this case was filed when the three-year statute of limitations began to run.  *See Infomir*, 2019 WL 8955234 at *12 ("Courts in this Circuit have generally applied a three-year statute of limitations to cases involving § 605 . . . .").

Plaintiff seeks damages for 1,800 subscribers, rounding down to eliminate double counting.  Defendants argue that Plaintiff seeks damages for subscribers outside the three-year statute of limitations.  Defendants' statute of limitations argument is an affirmative defense for

which Defendants bear the burden of proof. *See Sohm v. Scholastic Inc.*, 959 F.3d 39, 51 (2d Cir. 2020). Defendants have failed to sustain their burden.

Defendants point to the subscriber list they produced, which shows that 609 subscribers began their subscriptions before March 15, 2015, the last date within the three-year limitations period. Defendants question whether these subscribers may have cancelled their subscriptions before that date and argue that it is Plaintiff's burden to show they did not. While the evidence is unclear who was still a subscriber on the March 2015 statute of limitations date, it is Defendants' burden to prove their statute of limitations defense. Particularly here, it would make no sense to impose on Plaintiff the obligation of showing when certain subscribers cancelled, considering that Defendants have exclusive possession of this information and have not produced it to Plaintiff or the Court (so far as the Court is aware) in support of their defense. As Defendants have not shown that their retransmission to any of the 1,964 Russian TV subscribers was exclusively outside the limitations period, and Plaintiff has shown that at least 1,355 of subscribers were exclusively within the limitations period, the statute of limitations defense fails. Whether and how any of the 609 subscribers described above impact the number of violations is left for a later determination when damages are calculated.

### 3. **Willfulness**

The FCA is a "strict liability" statute, in that its violation results in liability regardless of the intent of the violator. *See Infomir*, 2019 WL 8955234 at *11. Defendants' use of unauthorized access codes from Third Party Vendors resulted in unlawful rebroadcasting and violated that statute. Plaintiff seeks enhanced damages, pursuant to 47 U.S.C. § 605(e)(3)(C)(ii), because Defendants' violations of FCA § 605(a) were allegedly willful. However, Plaintiff has not established willfulness.

Willfulness is "disregard for the governing statute and an indifference to its requirements." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 126-27 (1985). Interception and broadcasting television programming without permission can constitute willful conduct. *See J & J Sports Prods. Inc. v. Mar Y Las Estrellas Rest. Corp.*, No. 17 Civ. 1190, 2018 WL 4921656, at *8 (E.D.N.Y. July 17, 2018) (collecting cases), *R. & R. adopted*, No. 17 Civ. 1190, 2018 WL 4583489 (E.D.N.Y. Sept. 25, 2018). However, an affirmative act, on its own, is insufficient to show willfulness if the unauthorized broadcast is the result of an "innocent mistake." *See J & J Sports Prod., Inc. v. El Ojo Aqua Corp.*, No. 13 Civ. 6173, 2014 WL 4700014, at *6 (E.D.N.Y. Aug. 29, 2014), *R. & R. adopted*, No. 13 Civ. 6173, 2014 WL 4699704 (E.D.N.Y. Sept. 22, 2014).

According to Rudik, Defendant Techstudio purchased access codes that Rudik knew or believed provided authorized access to the Programming. Rudik erroneously believed that the Third Party Vendors were authorized to distribute the Programming, although he attempted but failed to confirm this at least with regard to Apeiron.

Plaintiff argues that it has shown willfulness because Rudik knew the cost of the Kartina access codes Defendant Techstudio had lawfully purchased, knew the comparatively lower cost of the access codes purchased from the Third Party Vendors and therefore knew, based on this discount, that the Third Party Vendors did not provide licensed content. This argument is unpersuasive and merely speculative. There is no evidence about why the Third Party Vendors' access codes were priced as they were, nor is there evidence of Rudik's knowledge about what factors might affect the pricing of access codes. The only evidence of knowledge or willfulness consists of Rudik's testimony that he believed the Third Party Vendors were authorized to distribute the Programming. Given Plaintiff's failure to offer any contrary evidence and

9

Plaintiff's burden of proof on the issue of willfulness, enhanced damages on the basis of willfulness are denied.

**B.     FCA § 605(e)(4)**

Plaintiffs allege that Defendants are liable under FCA § 605(e)(4), 47 U.S.C. § 605(e)(4), for selling customized STBs and developing the RTV App, which permits a U.S. consumer to access Plaintiff's retransmitted satellite-originated radio signals.  This claim fails as to both the STBs and the RTV App.

FCA § 605(e)(4) imposes liability on

> Any person who manufactures, assembles, modifies, imports, exports, sells, or distributes any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming, or direct-to-home satellite services, or is intended for any other activity prohibited by subsection (a) . . . .

The claim fails with regard to STBs because Plaintiff has not sustained its burden of proving the knowledge and function element of the violation.  The first element is satisfied; Defendant Techstudio sold 1,495 STBs to Russian TV subscribers, having purchased the STBs from non-party Infomir.  The second element is satisfied; an STB is an "electronic, mechanical, or other device or equipment" within the meaning of the statute.  It is a hardware device that when plugged into a television enables the television to receive digital signals.  Two of Plaintiff's witnesses viewed the Programming with a Russian TV STB, without entering an access code for programming, by plugging the device into a television.

However, Plaintiff has not met its burden of proving the third element of the claim -- that the STBs were "primarily of assistance in unauthorized decryption" or that Defendants "[knew] or [had] reason to know" that the STBs were intended to violate § 605(a).  § 605(e)(4).  Plaintiff either does not dispute or does not refute Defendants' evidence (1) that the Russian TV STBs do

not decrypt IPTV and (2) that the STBs were not "primarily" or "intended" for unauthorized activity as demonstrated by Kartina's records of its authorized sale of over 2,000 STBs to Defendants.  Accordingly, Plaintiff's claim that the STBs violate FCA § 605(e)(4) fails.

Plaintiff's claim as to the RTV App fails for the same reasons.  The app enables access to television programming on Samsung Smart TVs, Google Android devices and Apple iOS devices.  There is no evidence that the app decrypts anything, or that the app is primarily intended for unauthorized activity.  The claim also fails because the RTV App is not an "electronic, mechanical, or other device or equipment," as required by § 605(e)(4).  An online application, such as the RTV App, regardless of where it may be downloaded, is a software, *see Riley v. California*, 573 U.S. 373, 396 (2014) (describing mobile application software); *Meyer v. Uber Techs. Inc.*, 868 F.3d 66, 70 (2d Cir. 2017) (describing an Uber app), and not "electronic, mechanical, or other device or equipment."  Plaintiff argues that the RTV App is a "descrambling device."  *See Caruso*, 284 F.3d at 435.  This argument is rejected because a device is a "mechanical invention."  *See Device*, Black's Law Dictionary (10th ed. 2014).  Plaintiff does not cite a case, and the Court is unaware of any, that classifies software or an online application as a "device or equipment" under FCA § 605(e)(4).[1]  Defendants did not violate FCA § 605(e)(4) by selling or distributing either the STB or the RTV App.

---

[1] Plaintiff relies on the statement in *DISH Network, LLC v. Henderson*, No. 519 Civ. 1310, 2020 WL 2543045, at *6 (N.D.N.Y. May 19, 2020), that "Device Codes, which the defendants sold individually and preloaded onto a set-top box, were designed and produced for purposes of allowing access to the servers that support the Services, and thus are a "device" or "equipment" for purposes of Section 605(e)(4). Based on these allegations, the Court finds that Plaintiffs have plausibly alleged that Defendants distributed modified equipment that was used in the unauthorized decryption of satellite cable programming."  To the extent that the Court concluded

### C.      Individual Liability

Plaintiff seeks to impose individual liability on Rudik for FCA violations by the other

Defendants, which he owns and operates.  Rudik is jointly and severally liable for these

violations under a theory of vicarious liability.

Individual liability under FCA § 605(a), 47 U.S.C. § 605(a), requires a showing of

"contributory infringement, which arises when the individual authorized the violations" or

"vicarious liability, which arises when the individual had a right and ability to supervise the

infringing activities and had an obvious and direct financial interest in the exploitation of the

copyrighted materials."  *G&G Closed Cir. Events, LLC v. Vasquez*, No. 20 Civ. 2030, 2020 WL

8167387, at *2 (E.D.N.Y. Dec. 27, 2020) (internal quotations omitted and alterations included).

The Programming is copyrighted material.  *See Russian TV Co.*, 2019 WL 804506 at *4.

Rudik is the owner and operator of Defendants Russian TV, Techstudio, Servernaya and

ESTIDesign and the President of Techstudio. His control over Defendants' activities

demonstrates his right and ability to supervise those activities.  *See, e.g.*, *J & J Sports Prods.,*

*Inc. v. Usman*, No. 17 Civ. 5335, 2019 WL 6777387, at *3 (E.D.N.Y. Dec. 12, 2019) (finding

that a director and chief executive officer has the right and ability to supervise a company's

activity).  Kartina invoices show that it sold access codes to Rudik, and Rudik testified that he

purchased access codes from the Third Party Vendors after Kartina refused to sell him additional

access codes.  Rudik directed Techstudio and Servernaya to purchase equipment including STBs

and had ESTIDesign develop the RTV App.  Rudik also controls the financial transfers between

---

that the Device Codes rather than the set-top boxes were a "device" or "equipment" under the
statute, I respectfully disagree.

Techstudio and Russian TV.  Rudik has a direct financial interest in the unauthorized use of the Programming because he earns income from its streaming.

Defendants argue that Plaintiff has failed to show Rudik's individual liability because Plaintiff makes conclusory allegations or impermissibly attempts to lump Rudik's liability in with the other Defendants' liability.  These arguments are unpersuasive as Plaintiff has identified specific ways that Rudik exercised control over the other Defendants and profited from their activities.  Defendants cite *J & J Sports Prods. Inc. v. Vergara*, No. 19 Civ. 2382, 2020 WL 1034393, at *11 (E.D.N.Y. Feb. 6, 2020), *R. & R. adopted sub nom. J & J Sports Prods. Inc. v. Vergara*, No. 19 Civ. 2382, 2020 WL 1031756 (E.D.N.Y. Mar. 3, 2020), but unlike that case, where allegations were not backed by evidence, Plaintiff has shown through invoices, financial statements and testimony that Rudik controls the activities and finances of the Defendant entities and profits from their operations including being paid nearly $2 million in 2015.  Therefore, Rudik is jointly and severally liable with the Defendant entities for the above violations.

### D.    Defendants' Affirmative Defense of Unclean Hands

Plaintiff seeks summary judgment on Defendants' affirmative defenses.  Defendants pursue only their defense of unclean hands and have abandoned the others. *See Oneida Indian Nation v. Phillips*, 397 F. Supp. 3d 223, 232 (N.D.N.Y. 2019) (failing to address affirmative defenses results in their abandonment).  Defendants' theory is that Plaintiff hid the fact that Defendants purchased valid access codes from Kartina, and then Kartina, through Plaintiff, brought this suit seeking to find Defendants liable for unauthorized access and thereby drive Russian TV, Kartina's competitor, out of business.  Plaintiff is granted summary judgment on that defense.

The equitable doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Souratgar v. Lee Jen Fair*, 818 F.3d 72, 79 (2d Cir. 2016) (citing *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945)).  The misconduct must be "directly related to plaintiff's use or acquisition of the right in suit."  *Med. Soc'y of N.Y. v. UnitedHealth Grp. Inc.*, 332 F.R.D. 138, 150 (S.D.N.Y. 2019).  Generally, unclean hands is an equitable defense that applies only to equitable claims.  *See Henderson v. United States*, 575 U.S. 622, 625 n.1 (2015) (finding the unclean hands doctrine applies only when the misconduct has an "immediate and necessary relation" to the equity sought).  Plaintiff's statutory claim for damages is not barred by this doctrine.  *See Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 607 (2d Cir. 2005).

Plaintiff's equitable claim for injunctive relief also is not barred by the unclean hands defense.[2]  First, Plaintiff did not hide Kartina's sale of access codes to Defendant.  That fact was disclosed and alleged in paragraph 6 of the Second Amended Complaint.  Second, Defendants primarily accuse Kartina and not Plaintiff of misconduct.  Plaintiff's alleged fault -- accepting funding from Kartina to finance a portion of this lawsuit -- is only secondary.  Third, whatever Kartina's actions and motives, Defendants have not had the right to rebroadcast the Programming since at least September 2019, with the expiration of the last of the Kartina access codes Defendants purchased.  Defendants' unauthorized broadcasts continued until at least August 2020.  Plaintiff should not be precluded from enforcing its rights simply because Kartina

---

[2] It is unnecessary to decide whether Plaintiff's claim for declaratory judgment that Plaintiff "owns all rights, titles and interests to the Channels and Programming and that Defendants" own none is legal or equitable, since the unclean hands defense does not bar either legal or equitable claims in this action.

may benefit from that enforcement.  The equitable defense of unclean hands does not bar Plaintiff's claims for equitable relief and does not apply to Plaintiff's claim for statutory damages.

### E.     Damages

The Court reserves on the question of the appropriate amount, if any, of damages, attorneys' fees and costs.  A referral to Magistrate Judge Moses for a report and recommendation regarding these matters consistent with this opinion will issue separately.

Plaintiff has elected statutory damages rather than actual damages and lost profits.  "The party aggrieved may recover an award of statutory damages for each violation of subsection (a) involved in the action in a sum of not less than $1,000 or more than $10,000, as the court considers just."  47 U.S.C. § 605(e)(3)(C)(i)(II).  Among the questions Judge Moses may wish to consider are (1) whether to award damages for some limited number of violations or for all violations; (2) how to measure the number of violations when Defendants engaged in both authorized and unauthorized transactions, *cf., Infomir*, 2019 WL 8955234, at *11 (recommending that each unauthorized subscriber represents a separate violation of FCA § 605(a)) and (3) the number of ascertainable violations.

### F.     Permanent Injunction and Declaratory Judgment

A court may issue an injunction to preclude future violations of the FCA.  47 U.S.C. § 605(e)(3)(B)(i) (permitting the Court to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain violations of subsection (a)").  The Court has found that Defendants engaged in the unauthorized streaming of the Programming but not that Defendants' conduct was willful or knowing.

15

Declaratory relief is appropriate "(1) where the judgment will serve a useful purpose in clarifying and settling the legal relations in issue; or (2) when it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceedings." *Maryland Cas. Co. v. Rosen*, 445 F.2d 1012, 1014 (2d Cir. 1971); *accord Allstate Ins. Co. v. Avetisyan*, No. 17 Civ. 4275, 2021 WL 1227625, at *9 (E.D.N.Y. Mar. 5, 2021). Here, the judgment will clarify and settle the legal relations between the parties.

The Court has determined to grant a permanent injunction and declaratory relief. The parties shall file their respective letters by September 29, 2021, stating whether they have any comments or proposed modifications to the following language consistent with the decision above: "Defendants are permanently enjoined and restrained from broadcasting, rebroadcasting or otherwise transmitting or distributing the Programming unless the parties in the future otherwise agree in writing. The court declares that Defendants have no right, title or interest to broadcast, rebroadcast or otherwise transmit or distribute the Programming."

## V.    CONCLUSION

For the foregoing reasons, Defendants are liable for violating FCA § 605(a). The Court will refer the computation of damages, attorneys' fees and costs to Magistrate Judge Moses by separate order. The Court has determined to grant Plaintiff's requests for a permanent injunction and declaratory relief and will do so in a separate order after receipt of the parties' letters by September 29, 2021.

The Clerk of Court is respectfully directed to close the motions at Docket Numbers 243, 251, 261 and 269. Further, as the Findings of Fact and Conclusions of Law at Docket Number 291 has been amended, the Clerk of Court is respectfully directed to strike Docket Number 291.

Dated: September 22, 2021
        New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE